IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL E. MACKEY,

    Petitioner,                      2: 10 - cv - 2504 - JAM TJB

    vs.

M. D. BITER,

    Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

## I. INTRODUCTION

Petitioner is a state prisoner and is proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was convicted by a jury of murder, attempted murder and two counts of robbery along with corresponding enhancements. He was sentenced to seven years plus seventy-five years to life on the attempted murder and murder charges and enhancements. The court imposed but stayed two three-year sentences on the robbery convictions. Petitioner was also ordered to pay restitution. Petitioner raises three claims in his amended federal habeas petition; specifically: (1) violation of Batson v. Kentucky, 476 U.S. 79 (1986) for the prosecutor's strike against a potential juror because of her race ("Claim I"); (2) insufficiency of the evidence to sustain one of the robbery convictions ("Claim II"); and (3) due process violation on an unsubstantiated direct victim award of restitution ("Claim III"). For the

1

following reasons, Petitioner's amended habeas petition should be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND[1]

On October 17, 2006, Rob Thomas, Richard Miller, and defendant had plans to meet Daniel Reyes and Tomas Gonzalez. Reyes and Gonzales believed that Thomas, Miller and defendant intended to purchase from them approximately 12 ounces of marijuana for $3,000, but the three intended to take the marijuana by force. Before the meeting, Miller gave defendant a gun. When the two groups met in a parking lot, the drugs were wrapped in foil in a plastic bag, inside a duffle bag in the back of Reyes' car. Miller and defendant got into the back seat of the car that Reyes was driving with Gonzalez in the passenger seat. [FN 1] At defendant's direction, Reyes drove to Wilson Park, where the four occupants first viewed the marijuana in the trunk of the car and then returned inside the vehicle leaving the marijuana in the rear of the car. When Reyes asked for the money, defendant gave Gonzalez approximately $10 in one dollar bills. Gonzalez threw the money back at defendant, an argument ensued, Miller grabbed the marijuana and left the car, and defendant shot Gonzalez and Reyes. Defendant and Miller fled with the marijuana. Reyes died; Gonzalez underwent multiple surgeries and remained in a coma for five days.

> [FN 1] Thomas also got into the back seat but left the car before the drugs were examined at the park and the shooting occurred.

Defendant was charged in the information with one count of murder; one count of second degree robbery of Reyes; one count of attempted murder; and a second count of second degree robbery from Gonzales [sic]. All four counts included allegations under section 12022.53, subdivisions (b) and (d) that defendant used a firearm causing great bodily injury and death, and that he personally used a firearm within the meaning of sections 12022.53, subdivision (c). The first and third counts also alleged use of a firearm under section 12022.5, subdivision (a)(1).

(Slip Op. at p. 1-2 (internal citations omitted).)

Petitioner raised the three Claims he raises in his amended federal habeas petition to the state courts on direct appeal. The Court of Appeal affirmed the judgment on January 21, 2010 in

---

[1] The factual background is taken from the California Court of Appeal, First Appellate District Opinion on direct appeal filed January 21, 2010, and filed in this Court by Respondent as Exhibit C on December 13, 2010 (hereinafter the "Slip Op.").

2

a written decision. Petitioner then filed a petition for review in the California Supreme Court which raised the three issues he had raised in the Court of Appeal. The California Supreme Court summarily denied the petition for review on March 30, 2010.

In July 2010, Petitioner filed a federal habeas petition which raised the three claims that he raised on direct appeal to the California Court of Appeal and the California Supreme Court. On November 22, 2010, Petitioner filed an amended federal habeas petition which also included these three Claims. Respondent answered the petition in December 2010.

### III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. See Lindh v. Murphy, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Id. (citations omitted). Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask

whether the state court's application of clearly established federal law was "objectively unreasonable." See Williams v. Taylor, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly established federal law. See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents."). In this case, the last reasoned decision was from the Court of Appeal on direct appeal.

## IV. ANALYSIS OF PETITIONER'S CLAIMS

### A. Claim I

In Claim I, Petitioner argues that Batson was violated when the prosecutor improperly struck a potential juror because of her race. The California Court of Appeal provided the factual background of this Claim and analyzed it as follows:

> Defendant, who is African-American, unsuccessfully challenged the composition of the jury under Batson v. Kentucky (1986) 476 U.S. 79 (Batson) and People v. Wheeler (1978) 22 Cal.3d 258 (Wheeler). He now contends that the trial court erred in denying his Batson/Wheeler motion.
>
> During jury selection, the prosecutor exercised his fourth peremptory challenge against Ms. P., an African-American woman. In objecting under Batson and Wheeler, defendant stated that he believed Ms. P. "was excused based on her race." The prosecutor responded that a prima facie showing had not been made. He stated that at that point he had exercised four peremptory challenges, one to "Juror number 6, who appeared . . . to be about an 18-year old male, probably Asian descent," one to "a White or Hispanic female, . . . about 18, 19 years old," one to "another White or Hispanic female, about the same age," and one to Ms. P., "who is a Black female, about 19 years old. Her juror information shows she graduated high school and has a job about a year and a half. I think that would make her about 19, without any life

4

experience, or any family or children. [¶] . . . [¶] [Ms. P.] is the only Black person on the jury, aside from [Ms. V.]. [Ms. V.] has been challenged for cause by both the prosecution and the defense. Statistically, there is not a basis for a prima facie case."

The court observed that it had been expecting one of the attorneys to exercise a peremptory challenge to Ms. V. because both sides had challenged her for cause but the court had denied the challenges, and that a peremptory challenge to that juror was appropriate. Regarding Ms. P., the court stated, "I didn't hear any response from her whatsoever that in any way appeared to me to be out of the ordinary. And the problem here is, unless another African-American juror is selected, at this point you have effectively removed all of the African-American jurors from the panel." The court accepted the prosecutor's explanation that his decision was made based on her age and life experience. "Everyone knows young jurors have a hard time deciding cases like this, with no life experience. She has been out of high school a year. She hasn't been to college. She doesn't have a family . . . . She is only 19. I kicked off . . . the first guy . . . for the same reason, and the next two, . . . who are 18 or 19."

The following day the court ruled on the motion. It began by reviewing what had transpired. "At the time this motion was made we were beginning the peremptory challenges . . . [There] were seated at the time two African-American prospective jurors, one of whom . . . both sides had requested that the court excuse for cause, and the court had denied both requests. The other juror was female, who, in the court's opinion had relatively neutral answers to all of the questions asked of her. This juror was excused by the People and thereafter the <u>Batson/Wheeler</u> objection was made. . . . [¶] The court listened to the objection of [defense counsel] and did determine that there was a prima facie case made . . . . As I indicated, I thought that this juror's responses to the questions were relatively neutral. I didn't really hear anything that would have, to the court, raised a concern, and I expressed concern at that point, that because you had only two African-American jurors at that point, one of whom I felt could be challenged by either side, that having excused the second African-American juror, we had no African-American jurors, and I was very concerned about it . . . . [¶] [The prosecutor] thereafter indicated his reasons for the exercise, primarily due to the witness's age, lack of life experiences, and indicated that he felt that in a case of this nature, he wanted jurors that had – that were mature, and he felt that that particular juror did not have the life experiences necessary. He also pointed to the fact that he had excused several other young jurors for the same reason."

The court then gave the prosecutor an opportunity to explain further. The prosecutor reiterated that Ms. P. "graduated from the 12th grade, and had only a year and half work experience, which

5

made her about 19 based on the way she looked. And based on her form, she wasn't married, she didn't have children, and gave, not bad answers, but not much in the way of the answers or much information. She was similar, I thought also to the first juror I excused . . . ." He explained that this juror and another four panel members he had exercised peremptory challenges against had also appeared to be between 18 and 20 years old. He explained that of the jurors who had been seated but nevertheless were young, "the youngest one has already served on a jury and works in a bank. The other one is a medical worker and I believe has graduated from college." Finally he noted that there were two African-Americans who had been seated on the jury, "which I think is statistically probably consistent with the makeup of this county, although I will admit that the venire of this jury did not have a lot of African-Americans in it."

The court observed, "I have had [the prosecutor] many times in my court, and I do not feel that he was attempting to take jurors off this panel because of their racial makeup, and I do accept his explanation that he was concerned with life experiences of jurors, and that is what his primary motivation was. And he indicated this was a pretty much across the board, males, females, and various racial backgrounds, and ethnic backgrounds. So having said that, I did accept his explanation.

"Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. [Citations.] Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." (People v. Lenix (2008) 44 Cal.4th 602, 612.) "The Batson three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (Id. at pp. 612-613.)

"[A] defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. (Johnson v. California (2005) 545 U.S. 162, 170.) We need not evaluate whether there was a sufficient showing to meet this first requirement because the trial court ruled on the sufficiency of the prosecutor's reasons. "Once the trial court ruled on the credibility of the prosecutor's stated reasons, the issue of whether the defense had made a prima facie showing became moot." (People v. Jurado

(2006) 38 Cal.4th 72, 104.)

In reviewing the trial court's assessment of the legitimacy of the prosecutor's reasons, "the trial court is in the best position to determine whether a given explanation is genuine or a sham. For that reason, we continue to accord great deference to the trial court's ruling that a particular reason is genuine." (People v. Fuentes (1991) 54 Cal.3d 7-7, 720-721.) "A prosecutor asked to explain his conduct must provide a "'clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection." People v. Lenix, supra, 44 Cal.4th at p. 613.)

The record supports the trial court's finding that the prosecutor did not challenge Ms. P or other panel members with a discriminatory motive. The prosecutor excused other jurors whom he perceived to be young and lacking in life experience. Defendant argues that the prosecutor also allowed some young jurors to be seated. Although comparative analysis is appropriate in considering the validity of the prosecutor's explanation (People v. Lenix, supra, 44 Cal.4th at p. 622), the prosecutor's explanation was consistent with his acceptance and rejection of other prospective jurors. As just indicated, the prosecutor did challenge other non-African-American panel members who were young and just out of school; the younger person he did not challenge appeared to be somewhat older and to have additional experience beyond high school. The fact that the prosecutor challenged some panel members who did have the "life experience" he said he was seeking is hardly dispositive, since there were other factors that readily explain those challenges. Moreover, "comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (Ibid.) Age and lack of life experience are valid nondiscriminatory reasons for exercising a peremptory challenge. (People v. Cruz (2008) 44 Cal.4th 636, 657-658.) The fact that the prosecutor may not have used peremptory challenges against other young panel members does not render the reason given for this one invalid. "Two panelists [i.e., prospective jurors] might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behaviors, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (People v. Lenix, supra, at p. 624.)

7

> Moreover, two African-Americans ultimately served on the jury, which also undermines any inference of improper bias. (See People v. Cornwell (2005) 37 Cal.4th 50, 69-70 ["The circumstance that the prosecutor challenged one of two African-American prospective jurors does not support an inference of bias, particularly in view of the circumstance that the other African-American juror had been passed repeatedly by the prosecutor from the beginning of voir dire and ultimately served on the jury"], disapproved on other grounds by People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 22; People v. Gray (2005) 37 Cal.4th 168, 188 [no inference of discrimination raised where prosecutor excused two African-American's from the jury but two remained]; People v. Snow (1987) 44 Cal.3d 216, 225 [that the prosecutor accepted a jury containing minorities "may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a Wheeler objection, [although] it is not a *conclusive* factor"].)

(Slip Op. at p. 3-7.)

To establish a Batson claim, the defendant must first make a prima facie showing that a challenge was made on an impermissible basis, such as race. See 476 U.S. at 96; see also Johnson v. California, 545 U.S. 162, 170-71 (2005). To establish a prima facie case, a petitioner must show that (1) the prospective juror is a member of a cognizable racial group, (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motivated by race. See Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir. 2006) (citing Batson, 476 U.S. at 96). Where the defendant has made a prima facie showing of discrimination, the burden shifts to the prosecutor to offer a race-neutral reason for the challenge that relates to the case. See Johnson, 545 U.S. at 168. Where the prosecutor offers a race-neutral explanation for the challenge, the trial court decides whether the defendant has proved the prosecutor's motive for the challenge was purposeful racial discrimination. See id.; Batson, 476 U.S. at 98. The opponent of the strike has the ultimate burden of persuasion regarding racial motivation. See Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam). An en banc panel of the Ninth Circuit in Kesser v. Cambra, 465 F.3d 351, 359-60 (9th Cir. 2006) (en banc) discussed at length the requirements of a court in analyzing the third step of a Batson issue:

8

At this stage, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Purkett, 514 U.S. at 768. Although the burden remains with the defendant to show purposeful discrimination, the third step of Batson primarily involves the trier of fact. After the prosecution puts forward a race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." Id. To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but "whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion). "It is true that peremptories are often the subjects of instinct," and that "it can sometimes be hard to say what the reason is." Miller-El, 125 S.Ct. at 2332. "But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." Id. "While subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination. . . ." Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994).

The trier of fact may not turn a blind eye to purposeful discrimination obscured by race-neutral excuses. "[T]he prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." Batson, 476 U.S. at 98 n. 20 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981)). "A Batson challenge does not call for a mere exercise in thinking up any rational basis." Miller-El, 125 S.Ct. at 2332. Reasons must be "related to the particular case to be tried." Batson, 476 U.S. at 98. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768.

The court need not accept any proffered rationale. We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it." Johnson, 3 F.3d at 1331. The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'" Hernandez, 500 U.S at 363, 111 S.Ct. 1859 (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)); see also Miller-El, 125 S.Ct. at 2324 (noting that Batson requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712)); Batson, 476 U.S. at 93, 106 S.Ct. 1712 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct

1  evidence as may be available." (internal quotation marks omitted)).
2  A court need not find all nonracial reasons pretextual in order to find racial discrimination. "[I]f a review of the record undermines
3  the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."
4  Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003); see also United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the
5  court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral'
6  explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates
7  against their sufficiency.").

8  See also Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008) (discussing the court's inquiry

9  at the third step of a Batson analysis).

10     "'If a prosecutor's proffered reason for striking a [minority] panelist applies just as well

11  to an otherwise - similar [nonminority] who is permitted to serve, that is evidence tending to

12  prove purposeful discrimination to be considered at Batson's third step.'" Kesser, 465 F.3d at

13  360 (quoting Miller-El, 125 S.Ct. at 2325). Furthermore, "'the Constitution forbids striking even

14  a single prospective juror for a discriminatory purpose.'" United States v. Collins, 551 F.3d 914,

15  919 (9th Cir. 2009) (quoting United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994)).

16  Additionally, while not dispositive, the fact that a prosecutor accepted the relevant minority

17  group on the jury may be considered indicative of a nondiscriminatory motive. See Turner v.

18  Marshall, 121 F.3d 1248, 1254 (9th Cir. 1997)

19     As noted by the Court of Appeal, the focus of Petitioner's Batson claim is on the third

20  prong of the test. After Petitioner made his Batson challenge at trial, the prosecutor stated that

21  Ms. P was a black female about 19 years old. He further stated that her information showed she

22  graduated high school and has had a job for about a year and a half. He explained that, "I think

23  that would make her about 19, without any life experiences, or any family or children."

24  (Reporter's Augmented Tr. at p. 161-62.) The prosecutor continued that, "Youth is not a basis

25  for make a Batson/Wheeler motion. Life experience is a valid reason for excusing a person from

26  a jury[.]" (Id. at p. 163.) The prosecutor noted that, "I mean, she was 19 years old. Age and life

experience is one of the main things that both of us look for, or at least that is one of the main things I look for in picking jurors. Everyone knows young jurors have a hard time deciding cases like this, with no life experience. She has been out of high school a year. She hasn't been to college. She doesn't have a family. She is sitting there, and friendly enough, I think. She is only 19." (Id. at p. 166.)

Lacking life experience and being young are legitimate race-neutral reasons for striking Ms. P. See Mitleider v. Hall, 391 F.3d 1039, 1049 (9th Cir. 2004) (immaturity and "limited life experiences" comprise legitimate race neutral grounds for peremptory challenges of prospective jurors); United States v. You, 382 F.3d 958, 968 (9th Cir. 2004). As the prosecutor's reasons for striking Ms. P were race neutral, the burden then shifts to the Petitioner to show that the reasons were pretextual.

At the state court level, Petitioner attempted to show pretext through comparative juror analysis. Petitioner failed to show that the state court's rejection of Petitioner's pretext argument was an unreasonable application of clearly established federal law or was the result of an unreasonable determination of the facts. In his state court appellate brief, Petitioner argued that the prosecutor also struck potential jurors who did have life experience. However, comparative juror analysis requires a comparison between those who eventually were seated on the jury with the purported improperly struck potential juror, not a comparison between two struck potential jurors. See, e.g., Lewis v. Lewis, 321 F.3d 824, 827 (9th Cir. 2003) (explaining that comparative juror analysis of the *struck juror with the empaneled jurors* "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination) (emphasis added).

Nevertheless, Petitioner asserted further comparative juror arguments in the state court proceedings. Specifically, Petitioner argued that:

> Juror No. 1 (who does have an adult son), said only that he was opposed to the death penalty, but would have no problem with this case as the death penalty was not involved. Juror No. 6 was asked

11

> only if (s)he would not hold it against either side if some witnesses could not be called; (s)he would not. And juror No. 12 was asked only if she could follow the felony murder rule . . . . Other jurors appear to have been acceptable to the People only because they had once served on a prior jury, as little else was asked of them; those included Juror Nos. 3 and 4. And yet neither of the two alternate jurors (both of whom were acceptable to the People), had any prior jury experience.

(Resp't's Lodged Doc. Ex. D at p. 46.)

The record does not undermine the prosecutor's rationale for why he struck Ms. P. Petitioner's reliance on comparative juror analysis as described above does not satisfy Petitioner's burden with respect to establishing pretext. As previously noted, the prosecutor's stated rationale for striking Ms. P was that she was youthful and lacked life experience. Petitioner fails to show that the empaneled jurors outlined above (specifically jurors 1, 3, 4, 6 and 12) were similarly situated to Ms. P. For example, juror numbers 3 and 4 had the life experience of previously serving on a jury before. (See Reporter's Augmented Tr. at p. 121-22, 212.) Juror number 1 had an adult son who had previously been arrested for a DUI. (See id. at p. 144-45.) With respect to juror numbers 6 and 12, the mere fact that the prosecutor only asked a few questions of them does not show that they were similarly situated to Ms. P's youthfulness and that these empaneled jurors lacked life experience. Therefore, Petitioner's comparative juror analysis argument does not establish that the prosecutor's rationale for striking Ms. P was pretextual. Petitioner also fails to show that the Court of Appeal's finding that "the younger persons [the prosecutor] did not challenge appeared to be somewhat older and to have additional experience beyond high school" was an unreasonable determination of the facts.

Finally, as noted by the Court of Appeal, two African-Americans served on the jury, which, while not dispositive is indicative that the prosecutor had a non-discriminatory motive in striking Ms. P. See Turner, 121 F.3d at 1254. Upon considering the record as a whole, and in light of the above, Petitioner failed to show that the Court of Appeal's denial of this Claim was an unreasonable application of clearly established federal law or was the result of a decision

based on an unreasonable determination of the facts.  Claim I should be denied.

B.  Claim II

In Claim II, Petitioner argues that there was insufficient evidence to support the robbery conviction of Gonzalez.  The Court of Appeal analyzed this Claim as follows:

> Defendant next argues that there was insufficient evidence that Gonzalez had constructive possession of the marijuana to support the second robbery conviction.  "In evaluating a claim of insufficient evidence, we review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  All conflicts in the evidence are resolved in favor of the judgment and all reasonable inferences are drawn in its favor."  (People v. Neely (2009) 176 Cal.App.4th 787, 793.)
>
> Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."  (§ 211.)  "A person from whose immediate presence property was taken by force or fear is not a robbery victim unless, additionally, he or she was in some sense in possession of the property."  (People v. Scott (2009) 45 Cal.4th 743, 749.)  "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for purposes of the robbery statute. [Citations.] '[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.' [Citation.]  Two or more persons may be in joint constructive possession of a single item of personal property, and multiple convictions of robbery are proper if force or fear is applied to multiple victims in joint possession of the property taken."  (Id. at pp. 749-750.)  Constructive possession may be established by demonstrating "some type of 'special relationship' with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner."  (Id. at p. 753.)
>
> There was sufficient evidence that Gonzalez had constructive possession of the marijuana.  Reyes' girlfriend testified that she heard Reyes ask Gonzalez to accompany him on the drug sale because Reyes did not want to go alone.  Reyes told Gonzalez that in exchange he would be given some of the money from the sale.  "It is not necessary that the victim of the robbery also be the owner of the goods taken.  Robbery is an offense against the person who has either actual or constructive possession over the goods. [Citation.]  Thus, a store employee may be a victim of robbery even though he does not own the property taken and is not

13

in charge or in immediate control of the property at the time of the crime. [Citations.] Nor is it a defense that the victim was a visitor to a store and was not the true owner of money or property taken. [Citation.] Furthermore, a person may be convicted of robbing a janitor or night watchman by taking the employer's property." (People v. Estes (1983) 147 Cal.App.3d 23, 26-27.)

The evidence supports a finding that Gonzalez was an active participant in the transaction. Reyes did not want to engage in the transaction alone. Gonzalez was the person to whom defendant handed the dollar bills before the robbery took place. Although the testimony indicates that Reyes was the owner of the marijuana, it also supports a finding that Gonzalez was acting for the benefit of Reyes and was being paid for his participation in the transaction. Therefore there was sufficient evidence that Gonzalez had constructive possession of the marijuana and was also a victim of a robbery. [FN 3]

> [FN 3] The evidence that Gonzalez was an active participant in the transaction distinguishes this case from People v. Ugalino (2009) 174 Cal.App.4th 1060. In that case the court overturned a conviction for attempted robbery were [sic] the victim, Rider, was merely a roommate of the drug dealer who happened to be present in the house when the attempted robbery took place. The court noted that, "[i]t was undisputed that Rider did not have actual possession of the marijuana, and [the dealer] stored the marijuana locked in a safe in his bedroom. There was no evidence Rider, who had been living with defendant for only three to four months, had access to the safe. In fact, Rider did not even have a key to the apartment, most of time coming and going only when someone else was home." (Id. at p. 1065.)

(Slip Op. at p. 7-9.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond

1  a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson,
2  443 U.S. at 318). A petitioner for a federal writ of habeas corpus "faces a heavy burden when
3  challenging the sufficiency of the evidence used to obtain a state conviction on federal due
4  process grounds." Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the
5  writ, the habeas court must find that the decision of the state court reflected an unreasonable
6  application of Jackson and Winship to the facts of the case. See id.

   A federal habeas court determines sufficiency of the evidence in reference to the
substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at
324 n.16; Chein, 373 F.3d at 983. The California Court of Appeal aptly set forth substantive
elements that define robbery in California. See Cal. Penal Code § 211 ("Robbery is the felonious
taking of personal property in the possession of another, from his person or immediate presence,
and against his will, accomplished by means of force or fear."). Constructive possession of
property can support a robbery conviction, however, the California Supreme Court has explained
that constructive possession of property requires that there be some type of "special relationship"
with the owner of the property sufficient to demonstrate that the victim had authority or
responsibility to protect the stolen property on behalf of the owner. See People v. Scott, 45 Cal.
4th 743, 753, 89 Cal. Rptr. 3d 213, 200 P.3d 837 (2009).

   Petitioner argued as follows in the state court with respect to this Claim:

> Appellant contends he cannot be convicted of robbing Gonzalez
> because the marijuana that was stolen belonged to Reyes, and
> nothing the record establishes Gonzalez ever had an actual or even
> constructive possession of those drugs. As shown immediately
> below . . . there is no parent-child or other family relationship
> between Reyes and Gonzalez, nor did they live together, nor is
> there any evidence that Gonzalez was Reyes' employee or stood to
> make any money (such as a "finder's fee" or commission for
> setting up the deal, or in any way agreed to help protect and
> safeguard the marijuana, or Reyes, or both, during the deal.

(Resp't's Lodged Doc. Ex. D at p. 52-53.)

   Contrary to Petitioner's arguments, and as noted by the California Court of Appeal, there

15

was evidence in the record that Gonzalez had constructive possession of the marijuana. For example, Reyes' girlfriend testified that she overheard conversations between Gonzalez and Reyes whereby Reyes told Gonzalez that he wanted Gonzalez to accompany him down to Vallejo for the drug sale because he did not want to go alone and that Petitioner would get some of the money from the transaction for accompanying him down to Vallejo. (See Reporter's Tr. at p. 408-09.) Additionally, as further noted by the state court, Gonzalez was an active participant in the transaction as evidenced by him being handed money during the transaction. (See id. at p. 509.) Based on this record, and viewing the evidence in the light most favorable to the prosecution, Petitioner failed to show that there was insufficient evidence to convict him of robbing Gonzalez. Claim II should be denied.

    C. Claim III

In Claim III, Petitioner argues that his due process rights were violated when the trial court imposed an award of direct restitution "to Gonzalez in the amount of $50,000 without any factual determination, documentation or receipts to support that award." (Pet'r's Am. Pet. at p. 4.) However, the Ninth Circuit has stated that "§ 2254 does not confer jurisdiction over a state prisoner's in-custody challenge to a restitution order imposed as part of a criminal sentence." See Bailey v. Hill, 599 F.3d 976, 982 (9th Cir. 2010). Therefore, Claim III should be denied.

## V. CONCLUSION

For all of the foregoing reasons, IT IS RECOMMENDED that the amended petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are

1  advised that failure to file objections within the specified time may waive the right to appeal the
2  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he
3  elects to file, Petitioner may address whether a certificate of appealability should issue in the
4  event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules
5  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability
6  when it enters a final order adverse to the applicant).

7  DATED: January 11, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE